**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| **QUANTUM PRACTITIONER SERVICES, LLC,**<br><br>**Plaintiff,**<br>**v.**<br><br>**ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services,**<br><br>**Dr. MEHMET OZ, in his official capacity as Administrator of the Centers for Medicare & Medicaid Services,**<br><br>**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,**<br><br>**CENTERS FOR MEDICARE & MEDICAID SERVICES**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **NO. 8:26-CV-03171** |

## AMENDED ORIGINAL COMPLAINT

Plaintiff Quantum Practitioner Services, LLC (“**Plaintiff**”), in its Complaint against Robert F. Kennedy, Jr., in his official capacity as Secretary of Health and Human Services (the “**Secretary**”), Dr. Mehmet Oz, in his official capacity as Administrator of CMS (the “**Administrator**”), United States Department of Health and Human Services (“**HHS**”), the Centers for Medicare & Medicaid Services

("**CMS**" and, together with HHS, CMS, and the Secretary, "**Defendants**"), allege as follows:

## I. <u>NATURE OF THE ACTION</u>

1. This case involves the Medicare payment and later denial of medically necessary services involving the use of skin-substitutes for chronic, non-healing wounds of the lower extremities, including diabetic foot ulcers ("**DFUs**") and non-healing venous leg ulcers ("**VLUs**"). These are open wounds on a person's lower extremities which are painful, extremely difficult to treat, and resistant to traditional wound care treatments. For decades, physicians and other qualified providers have treated these wounds with human cell and tissue-based products—often referred to as skin substitutes[1]—to cover wounds, and their innate properties stimulate and promote wound healing. And for decades, Medicare has covered skin substitutes as medically necessary for the care of wounds that have failed standard treatment under Part B, *see* 42 U.S.C. § 1395 *et seq.*, recognizing that these products promote healing and can stave off infection, amputation, and even death; indeed, Medicare has categorized this exact class of treatment as reasonable and necessary medical care. *See Medicare Part B Payments for Skin Substitutes*, U.S. DEP'T OF HEALTH & HUMAN SERVICES, Office of Inspector General, Project Number: OAS-25-09-005

[1] Nicole M. Vecin, et al., *Skin substitutes as treatment for chronic wounds: current and future directions*, FRONTIERS IN MEDICINE (August 29, 2023).

(Nov. 15, 2024) ("Skin substitutes help aid in wound healing and redevelopment of skin. Medicare covers skin substitutes that are reasonable and necessary for the treatment of an enrollee's condition.").

2. The skin-substitute treatment at issue in this case is the Dual Layer Impax Membrane ("**Impax**") (HCPCS code Q4262). The Dual Layer Impax Membrane is a sterile, non-fluid amniotic membrane allograft—a solid tissue-based product used as an advanced wound care modality for the treatment of chronic wounds that have not adequately responded to standard wound management measures.

3. Plaintiff is a Florida-based wound care practice that provided wound care to three Medicare beneficiaries—R.M., D.O., and J.S.—suffering from chronic, non-healing wounds of the lower extremities. Plaintiff treated these beneficiaries with Impax Membrane on various dates between May 25, 2023, and August 30, 2023. Each beneficiary had exhausted conventional wound care treatments before receiving skin substitute applications, and each showed documented clinical improvement following treatment. Medicare initially paid the claims.

4. Defendants later reopened and denied the services following a post-payment audit finding that the medical treatment was not reasonable and necessary. The Southeastern Unified Program Integrity Contractor, SafeGuard Services, LLC,

("**UPIC**") assessed an overpayment of $2,251,763.60, and First Coast Service Options, Inc., the Medicare Administrative Contractor ("**MAC**"), directed Plaintiff to return the payments (of $2,110,778.68). Plaintiff appealed the audit findings and claims denials as set forth under 42 U.S.C. § 1395ff and 42 C.F.R. Part 405, subpart I.

5. After receiving unfavorable decisions at the first two levels of the administrative review process—the MAC redetermination and the Qualified Independent Contractor ("**QIC**") reconsideration—based on allegations that the services were "investigational," "lack[ed] evidence of being safe and effective for wound treatment," and that the documentation did not support medical necessity, Plaintiff brought its appeal to the Administrative Law Judge ("**ALJ**"). *See* Ex. 1 (MAC Redetermination Decisions) and Ex. 2 (QIC Reconsideration Decision). The ALJ issued an unfavorable decision, erroneously classifying Impax as an "amniotic fluid allograft," refused to consider volumes of peer reviewed medical literature, and concluded that Impax was experimental and investigational. *See* Ex. 3 (ALJ Decision, OMHA Appeal Number 3-14553059676).

6. Plaintiff timely requested that the Medicare Appeals Council ("**Council**") review the ALJ's unfavorable decision. However, the Council failed to issue a decision, dismissal, or remand order within the 90-day timeframe prescribed by 42 C.F.R. § 405.1100(c). Plaintiff thereafter filed a Request for

Escalation to Federal Court pursuant to 42 C.F.R. § 405.1132, invoking its right to seek judicial review. The Council granted Plaintiff's request. *See* Ex. 4 (Council's Notice and Order dated August 20, 2026, Docket Number M-25-4188).

7. Plaintiff has fully exhausted the administrative appeals process as set forth under 42 U.S.C. § 1395ff and 42 C.F.R. § 405 Subpart I. Plaintiff therefore brings this lawsuit to seek relief for the denied claims totaling $2,110,778.68.

## II. Parties

8. Plaintiff is a limited liability company organized under Florida law, with its principal place of business at 6547 Kenava Loop, Palmetto, Florida 34221. Plaintiff is enrolled in the Medicare program (NPI: 1194426197) and furnishes healthcare services to Medicare beneficiaries, including patients who have been diagnosed with chronic, non-healing wounds of the lower extremities.

9. Defendant Robert F. Kennedy, Jr., sued in his official capacity only, is the Secretary of Health and Human Services, which administers the Medicare and Medicaid programs established under titles XVIII and XIX of the Social Security Act. References to the Secretary herein are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires. His official address is 200 Independence Avenue S.W., Washington, D.C. 20201.

10. Defendant Dr. Mehmet Oz, sued in his official capacity only, is the Administrator of CMS. The Administrator is responsible for administering the Medicare program. His official address is 7500 Security Boulevard, Baltimore, Maryland 21244.

11. Defendant Department of Health and Human Services is an executive department in the United States government headquartered at 200 Independence Avenue SW, Washington, DC 20201.

12. Defendant Centers for Medicare & Medicaid Services is a component of HHS with responsibility for day-to-day operation and administration of the Medicare program and is located at 7500 Security Boulevard, Baltimore, Maryland 21244. CMS administers the Medicare program by contracting with private entities such as MACs, Recovery Audit Contractors ("**RACs**") and UPICs whose duties are described herein. In addition to MACs, RACs and UPICs, CMS also contracts with an entity known as the Administrative QIC ("**AdQIC**"), which is responsible for monitoring the application of Medicare payment and coverage policies in individual cases as they make their way through the Medicare administrative review process. The MACs, RACs, UPICs and AdQIC have initiated and are pursuing an unlawful, unpublished practice under which the Secretary's agents systematically deny Medicare claims for skin substitute products that Medicare previously covered and paid for, on the newly asserted ground that those products are "experimental" or

"investigational" (the "**Retroactive Denial Policy**"). They are agents of CMS, and CMS ultimately controls their actions.

## III. JURISDICTION AND VENUE

13. This action arises under the Medicare Statute, title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.

14. Plaintiff has exhausted the administrative appeals process as set forth under 42 U.S.C. § 1395ff and 42 C.F.R. § 405 Subpart I. Jurisdiction over Plaintiff's individual coverage and overpayment claims is proper under 42 U.S.C. §§ 405(g), 1395ff(b). To the extent Plaintiff's claim challenging the Secretary's unpublished retroactive denial policy is not encompassed within that channel of review, jurisdiction over that claim is also proper under 28 U.S.C. § 1331.

15. Venue is proper in this judicial district in accordance with 42 U.S.C. § 405(g), 28 U.S.C. § 1391(e), and 42 C.F.R. § 405.1136(b).

16. All conditions precedent to this action have occurred, been performed, or been waived.

## IV. BACKGROUND

### A. The Medicare Program

17. Congress established Medicare as the primary federal health insurance program serving elderly and disabled individuals.

18. The Secretary administers the Medicare program directly and delegates its day-to-day implementation and oversight to CMS. 42 U.S.C. § 1395kk.

19. Medicare Part A covers inpatient hospital services, home health services and hospice services. Medicare Part B, which is relevant to the claims in this civil action, covers physician services that are not provided in an inpatient setting. 42 U.S.C. § 1395 *et seq*. Physician services include items, supplies, and physician-administered drugs that are provided as part of a physician visit or procedure.

20. Consistent with that framework, Medicare Part B has for many years reimbursed physicians and other qualified providers for skin substitutes they use to treat chronic, non-healing wounds including wounds of the lower extremities such as VLUs or DFUs. These products are administered in a variety of clinical environments, from outpatient hospital settings and physician offices to skilled nursing facilities and in the patient's home setting. Both physicians and patients have come to rely upon their availability to treat chronic wounds. CMS's recognition of the efficacy of these products and the important clinical benefits they provide has supported this longstanding coverage.

**B. Medicare Administrative Contractors**

21. The Medicare statute empowers the Secretary to contract with MACs to carry out the day-to-day administration of the Medicare program. Absent a

controlling National Coverage Determination ("**NCD**") or Local Coverage Determination ("**LCD**"), a MAC must make claim-by-claim determinations of whether an item or service qualifies as "reasonable and necessary," and therefore covered, under 42 U.S.C. § 1395y(a)(1)(A).

22. In certain jurisdictions, MACs have directed their coverage of skin substitutes by adopting LCDs, which constitute written coverage policies establishing that a particular product or service satisfies Medicare's medically reasonable and necessary standard. 42 U.S.C. § 1395ff(f)(2). Three MACs, specifically First Coast Service Options, Inc., CGS Administrators, LLC, and Novitas Solutions, Inc., implemented LCDs that expressly authorized coverage of skin substitute products for the treatment of chronic, non-healing wounds of the lower extremities.

23. In adopting these LCDs, the MACs do not exclude any specific brands of skin substitutes. *See* LCD L36377, Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities (2015) (the "**First Coast 2015 LCD**"); LCD L36690, Wound Application of Cellular and/or Tissue Based Products (CTPs), Lower Extremities (2016) (the "**CGS 2016 LCD**"); LCD L35041, Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Healing Wounds (2015) (the "**Novitas 2015 LCD**").

24. The acceptance of skin substitutes as a covered treatment has extended well beyond those jurisdictions with formal LCDs. MACs that had not published a dedicated LCD nonetheless approved claims for skin substitute treatments on a routine basis, indicating that coverage was not contingent upon the existence of a written coverage determination but instead reflected a broad, nationwide recognition of the medical appropriateness of these products for treating chronic, non-healing wounds.

25. Absent an LCD or NCD, the MAC's responsibilities include making initial determinations on a case-by-case basis as to whether to pay for services provided to Medicare beneficiaries, i.e., whether to "cover" those services, when claims are submitted for reimbursement. In this case, First Coast Service Options, Inc., Plaintiff's MAC, has adopted LCD L36377, which establishes coverage criteria for skin substitute grafts for treatment of DFUs and VLUs of the lower extremities, and applies to the services at issue in this case. Dictated by the Medicare statute, First Coast would approve payment for items and services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A).

26. CMS has interpreted this "reasonable and necessary" standard to mean the item or service is medically appropriate (including its duration and frequency),

safe and effective, and not experimental or investigational.[2] For the MAC to consider coverage and payment for any item or service, the information submitted by the provider must corroborate the documentation in the beneficiary's medical record and confirm that Medicare coverage criteria have been met.[3]

27. In reliance on this longstanding pattern of coverage, Plaintiff has for years applied skin substitute products, including Impax, to Medicare beneficiaries suffering from chronic, non-healing wounds. Medicare has historically reimbursed these treatments based on its recognition that such products facilitate wound healing. Plaintiff's continued use of these products was grounded in a reasonable expectation, supported by years of consistent reimbursement, that Medicare would maintain coverage for eligible beneficiaries receiving these medically appropriate treatments.

28. Plaintiff had no reason to anticipate that Medicare would change course and deny reimbursement for these products. At no point did Plaintiff receive written or verbal notification that skin substitute products would cease to be covered. In fact, claims for these products were routinely approved. Neither CMS nor any MAC issued a general notice to the medical community indicating that payment for skin substitutes would be denied, no utilization review committee communicated that

[2] *See, e.g.*, MPIM § 3.6.2.2 (last revised Aug. 9, 2024), https://tinyurl.com/yxtnf78e.
[3] MPIM § 3.3.2.1, https://tinyurl.com/yxtnf78e.

these products would lose coverage, and Plaintiff had no reason to advise any beneficiary of a risk of non-payment because no such risk was apparent.

### C. The Medicare Program Integrity Manual ("MPIM") and the Reasonable and Necessary Standard

29. CMS issues sub-regulatory guidance to MACs and adjudicators, including the Medicare Program Integrity Manual ("**MPIM**"), CMS Pub. 100-08, which sets forth a framework for determining whether an item or service is "reasonable and necessary" under 42 U.S.C. § 1395y(a)(1)(A) in the absence of a controlling NCD, LCD, or other coverage policy. MPIM, Ch. 3, §§ 3.3.3, 3.6.2.1–3.6.2.2. Under this framework, an item or service is reasonable and necessary if it is safe and effective, not experimental or investigation, and appropriate, in accordance with accepted standards of medical practice. *Id.*

30. The MPIM is sub-regulatory guidance, not a binding regulation. ALJs and the Council are not strictly bound by the MPIM, but Medicare regulations direct that adjudicators afford MPIM guidance substantial deference "if they are applicable to a particular case."

31. Because LCD L36377 is applicable the services at issue, its coverage criteria provide guidance as to whether those services are reasonable and necessary. In the alternative, to the extent LCD L36377 is found not to apply, the criteria set forth in MPIM, Ch. 3, § 3.6.2.2 can be evaluated, and the services at issue independently satisfy those criteria.

**D. The Medicare Appeals Process**

32. Congress established a five-tiered administrative appeals process for disputes arising from Part B claims. 42 U.S.C. § 1395ff(a)–(d); *see* 42 C.F.R. § 405.904.

33. Level 1: When a MAC makes an "initial determination" on a Part B claim, a dissatisfied party may request that the contractor perform a "redetermination." 42 U.S.C. § 1395ff(a)(3); 42 C.F.R. § 405.904(a)(2).

34. Level 2: A party dissatisfied with the redetermination may then seek "reconsideration" by a Qualified Independent Contractor ("**QIC**"), which conducts an independent review of the claim. 42 U.S.C. § 1395ff(c); 42 C.F.R. §§ 405.960, 405.974(a).

35. Level 3: Following an unfavorable reconsideration, a party may request a hearing before an ALJ at the Office of Medicare Hearings and Appeals ("**OMHA**"). 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. § 405.936(a). The ALJ is not bound by findings from lower levels and conducts a *de novo* review of the claims on appeal and fully examines the issues, questions witnesses, and accepts material evidence. 42 C.F.R. § 405.1030(b).

36. Level 4: If a party is dissatisfied with the ALJ's decision, or if the Medicare Appeals Council (the "**Council**") elects to act on its own motion, the Council may review the ALJ's decision *de novo* and may adopt, modify, or reverse

the decision. 42 U.S.C. § 1395ff(d)(2); 42 C.F.R. §§ 405.1100(a), (c), 405.1108(a), 405.1110, 405.1128(a)–(b). The Council's decision is final and binding on all parties unless a federal district court issues a decision modifying it. 42 C.F.R. § 405.1130. If the Council does not issue a decision, dismissal, or remand within the adjudication period, the appellant may request that the appeal be escalated to federal district court. 42 C.F.R. § 405.1132(a).

37. Level 5: A party dissatisfied with the Council's final decision, or an appellant who requests escalation when the Council does not complete its review within the applicable adjudication period, may file an action for judicial review in federal district court. 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. §§ 405.1130, 405.1132, 405.1136(a)(1). In an escalated appeal, the ALJ's decision remains the operative decision unless the district court issues a decision. 42 C.F.R. § 405.1048(a)(1).

**E. VLUs and DFUs, generally.**

38. VLUs are open, chronic wounds of the lower extremity that develop because of chronic venous insufficiency ("**CVI**"), a condition in which failing veins cause blood to flow backward and pool in the lower leg. The resulting increase in venous pressure (known as venous hypertension) damages the surrounding tissue, impairs oxygen delivery to cells, and ultimately causes the skin to break down into an open wound.

39. DFUs, by contrast, are open, chronic wounds of the foot or ankle that develop in patients with diabetes mellitus. Prolonged high blood sugar damages the peripheral nerves, which causes a loss of protective sensation, so repeated pressure, friction, and minor injuries to the foot go unnoticed and break down the skin. In many patients, diabetes also causes peripheral arterial disease, which narrows the arteries and restricts the delivery of oxygenated blood to the foot. That impairs the body's ability to heal the wound and leaves it vulnerable to infection, gangrene, and amputation.

40. VLUs and DFUs are among the most common chronic wounds encountered in clinical practice. Multiple MACs across various jurisdictions have recognized that over 90% of chronic lower extremity ulcers are related to venous stasis disease and diabetic neuropathy. It is estimated that approximately 1.5 million patients in the United States develop venous leg ulcers, and the total direct medical costs from venous ulcer treatment in the United States have been estimated to exceed $20 billion annually.

41. VLUs and DFUs are notoriously resistant to standard wound-care measures. Because the underlying CVI continuously impairs venous return and increases pressure in the lower leg, the wound bed remains poorly oxygenated and prone to stalling in the inflammatory phase, even when the clinician implements

traditional therapies, including infection and edema control, mechanical offloading, compression, debridement, and management of inciting medical issues.

42. VLUs and DFUs frequently meet the rubric for chronic, non-healing wounds, as they are characterized by chronicity, slow healing, and high recurrence rates. For example, even after healing, recurrence rates for venous ulcers are known to be as high as 20–40% within the first year, and as high as 60% after five years.

**F. Skin-Substitutes, generally.**

43. Because traditional measures frequently prove insufficient to heal chronic VLUs or DFUs, the Medicare program covers the application of a class of biologic wound-care products known as "skin substitutes" or "cellular and tissue-based products" ("**CTPs**").

44. Skin substitutes are biologic covers for refractory wounds that generally involve the creation of immunologically inert biological products (containing protein, hormones, or enzymes seeded into a matrix), which may stimulate or facilitate healing or promote epithelialization. *See* Novitas LCD L35041 at 6 (observing the addition of skin substitutes to certain wounds "may afford a healing advantage over dressings and conservative treatments alone when those options appear insufficient to achieve complete healing"). First Coast—Plaintiff's MAC—takes the same view in LCD L36377, which governs skin substitute coverage in Florida for the dates of service at issue. As LCD L36377 explains,

"[d]espite advancements in various synthetic occlusive dressings some ulcers fail to heal so other adjuncts to wound care such as the development of skin substitutes have been employed to increase success rates of healing." First Coast LCD L36377 at 5. LCD L36377 expressly defines covered skin substitute grafts to include "non-autologous human skin (e.g., dermal or epidermal, cellular and acellular) grafts (e.g., homograft, allograft) . . . and biological products that form a sheet scaffolding for skin growth," and covers their application to DFUs and VLUs that have failed to respond to documented conservative wound care. *Id.* at 5–7.

45. Products commonly described as skin substitutes are regulated by the FDA under one of four categories depending on the origin and composition of the product, and are listed with a Healthcare Common Procedure Coding System (HCPCS) code in the Q41XX series. *Id.* One such category encompasses Human Cells, Tissues, and Cellular and Tissue-Based Products ("**HCT/Ps**") regulated under Section 361 of the Public Health Service Act and 21 C.F.R. Part 1271. Other MACs' LCDs—including Novitas LCD L35041, and CGS LCD L36690—provide that each 361 HCT/P product "may be considered reasonable and necessary" if it has a 361 HCT/P exemption and is being used in accordance with that product's individualized application guidelines.

46. Clinical literature supports the use of amniotic membrane products in this context. Peer-reviewed studies demonstrate that the use of amniotic tissue

derivatives in wound care allows wounds to heal more quickly and leads to significantly higher wound closure rates as compared to other products.[4] Recent peer-reviewed literature further confirms that this therapeutic benefit extends across the broader class of amniotic and other HCT/Ps, regardless of the specific brand or the wound's location, etiology, or treatment setting,[5] including patients' homes, in addition to private clinics and nursing homes.[6]

47. As noted above, human amniotic tissue products, including Impax, fall within the HCT/P category. To be regulated solely under Section 361, rather than subjected to the FDA's more onerous premarket review and approval requirements for drugs, biologics, or devices, an HCT/P must satisfy four criteria set forth at 21 C.F.R. § 1271.10(a), including that the product is minimally manipulated.

---

[4] *See* Schmiedova I., et al., *Using of Amniotic Membrane Derivatives for the Treatment of Chronic Wounds*, MEMBRANES *(Basel)* 11(12):941 (2021); Lahmal K., et al., *Systematic review on the rational use of amniotic membrane allografts in diabetic foot ulcer treatment*, BMC SURG. 21(1):87 (2021); *Evaluation of Cellular, Acellular, and Matrix-Like Products (CAMPs) in the Management of Nonhealing Diabetic Foot Ulcers: An Interim Analysis of the STABLECAMP Trial*, 1 Int'l J. Tissue Repair (Oct. 2025); *Evaluation of Cellular, Acellular, and Matrix-Like Products in the Management of Nonhealing Venous Leg Ulcers: An Interim Analysis of STABLECAMP*, 1 Int'l J. Tissue Repair (Oct. 2025) ALJ Dec. No. 3-15400961475, OMHA-152 at 4 (citing both studies).

[5] *See* Daniel Kapp et al., *Efficacy of a Dual-Layer Pre-Hydrated Amniotic Membrane Allograft in the Treatment of Hard-to-Heal Wounds*, 35 J. WOUND CARE 150 (Feb. 2026).

[6] *See* Shaun Carpenter et al., *Efficacy of Cellular and/or Tissue-Based Product Applications on All Non-Pressure Injury Chronic Wound Types in a Medicare Private Practice Model*, 37 WOUNDS 292 (Aug. 2025).

**G. Plaintiff's Treatment of the Beneficiaries.**

48. Plaintiff is operated by Alexander Stephens, APRN, who serves as the treating wound care provider. Plaintiff provides wound care services to Medicare beneficiaries, including the treatment of chronic lower extremity ulcerations using debridement and skin substitute products. In this case, Plaintiff provided treatment to three Medicare beneficiaries: R.M., D.O., and J.S.

**1. Beneficiary R.M.**

49. Beneficiary R.M. is a 73-year-old male diagnosed with, among other things, type 2 diabetes mellitus, and presented with chronic, non-healing wounds to his left foot and left ankle that had persisted for over twenty years. Prior to Plaintiff's intervention, R.M. underwent extensive conservative wound care that failed to close his wounds. Plaintiff treated R.M. with Impax on May 25, June 1, June 8, and June 28, 2023. At each visit, Plaintiff documented the wound dimensions, performed debridement to expose healthy granulation tissue, and recorded the lot number, expiration date, and quantity of each graft applied. By the June 8 visit, both wounds had achieved 100% granulation tissue post-debridement. On June 28, both wounds showed measurable reduction in size.

**2. Beneficiary D.O.**

50. Beneficiary D.O. is a 61-year-old female diagnosed with, among other things, type 2 diabetes mellitus with diabetic peripheral angiopathy, chronic venous

insufficiency, and a non-pressure chronic ulcer of the right lower leg; she is confined to a wheelchair. She presented with multiple VLUs on her right lower leg, front left lower leg, top left foot, and outer back portion of left lower leg, dating to November 15, 2022. For months before Plaintiff became involved, D.O. received skilled home health nursing wound care that proved unsuccessful.

51. Beginning June 8, 2023, Plaintiff applied Impax to D.O. on a weekly basis through August 30, 2023, documenting wound dimensions, performing debridement, and recording each graft's lot number, expiration date, and quantity at every visit. The results were significant: many wounds closed entirely, while others decreased markedly in size, reaching 98% or 100% granulation tissue. D.O. reported that the grafts produced more progress than anything she had tried in over a year.

**3. Beneficiary J.S.**

52. Beneficiary J.S. is an 83-year-old male diagnosed with, among other things, type 2 diabetes mellitus who presented with chronic DFUs on both feet. Before Plaintiff's involvement, J.S. had exhausted a wide range of treatments without success, including IV antibiotics, home health wound care with silver dressings, and hyperbaric treatment. His treating physicians concluded that the poor blood flow gave a very poor outlook for saving the toes.

53. Starting July 6, 2023, Plaintiff applied Impax to J.S. on six occasions through August 24, 2023, documenting wound dimensions, performing sharp

debridement, and recording each graft's lot number, expiration date, and quantity at every visit. The back right foot wound progressed from 98% to 100% granulation tissue. J.S. himself reported that the grafts produced healing he had "not experienced before."

54. Plaintiff's treatment of the Beneficiaries satisfied LCD L36377's coverage criteria. With respect to the DFUs in particular, R.M. and J.S. each carried a diagnosis of type 2 diabetes mellitus, presented with chronic foot wounds that had failed conservative treatment, and received Impax applications that Plaintiff documented at every visit with wound measurements, debridement, and graft lot information, as LCD L36377 requires.

55. In the alternative, even if LCD L36377 were found not to apply, the services independently satisfy the reasonable and necessary criteria of MPIM § 3.6.2.2. Impax is safe and effective and not experimental or investigational, and the services were furnished in accordance with accepted standards of medical practice, in a setting appropriate to each beneficiary's medical needs and condition, by qualified personnel, and in a manner that met, but did not exceed, each beneficiary's medical need. *See* MPIM, Ch. 3, § 3.6.2.2.

**H. Medicare Initially Pays the Claims then Issues Overpayment Demand.**

56. Plaintiff's claims for the Impax Membrane treatments furnished to R.M., D.O., and J.S. were billed under HCPCS code Q4262. They were billed along

with the related application codes CPT 15271, 15272, 15273, 15274, 15275, 15276, 15277, and 15278, and with E/M codes 99348 and 99349 (modifier 25) on certain dates of service. Medicare initially paid the claims.

57. Following a post-payment review, however, the UPIC reviewed all 43 claims involving 73 lines of services across all three beneficiaries, found a denial rate of 100%, and assessed an overpayment of $2,251,763.60. The MAC subsequently issued an overpayment demand of $2,110,778.68 on May 8, 2024.

## I. Procedural Background

### Level 1: Redetermination

58. At the first level, redetermination, the MAC issued 41 unfavorable redetermination decisions. The MAC claims it utilized LCD L36377 for its review and upheld the overpayment and found in each decision that Impax was used for a non-homologous and therefore investigational purpose, and thus not reasonable and necessary.

### Level 2: Reconsideration

59. At the second level, reconsideration, the QIC wrongly referred to Impax as an "amniotic liquid allograft" and issued an unfavorable reconsideration decision for all 41 claims, finding that the documentation did not support the services as reasonable and necessary, that there was "insufficient support from double-blinded, randomized human clinical trials for safety and effectiveness" of Impax. *See* Ex. 2.

**Level 3: ALJ Hearing**

60. At the third level, ALJ Sean McKee conducted a hearing and issued an unfavorable decision on July 15, 2025. *See* Ex. 3. The ALJ committed a fundamental error by repeatedly characterizing Impax as an "amniotic fluid allograft." *Id.* It is not. Plaintiff's expert, Dr. Adrianne Ross, DPM, testified at the hearing that the product "is not a liquid product," and the ALJ himself elsewhere referred to it as a "membrane wrap tissue allograft." *Id.* Impax is a non-fluid amniotic membrane allograft—a solid tissue product—not a fluid-based product.

61. The relevant First Coast LCD (L36377) in effect for the dates of service at issue, however, recognizes non-fluid amniotic membrane allografts as a covered category of skin substitutes. By incorrectly labeling Impax as an amniotic fluid allograft, the ALJ applied the wrong analytical framework and reached a flawed conclusion that the product was experimental and investigational. Had the ALJ correctly identified the product as a membrane-based tissue allograft, it would have been recognized as falling squarely within the class of skin substitutes that First Coast has covered as reasonable and necessary under LCD L36377.

62. The ALJ further erred by failing to give proper deference to the treating clinician's medical necessity determination. Plaintiff provided detailed testimony and documentation establishing each beneficiary's medical need for the treatment, but the ALJ dismissed this evidence in concluding that the services were

experimental and investigational without adequately considering the documented medical necessity for each individual beneficiary. *Id.*

63. The ALJ further erred by refusing to consider the peer-reviewed medical literature supporting the use of amniotic membrane allografts in wound care, and then faulting Plaintiff for its absence. *Id.* The ALJ excluded the literature attached to Plaintiff's pre-hearing brief for lack of good cause, reasoning that "[a]t no time prior to the Appellant's June 25, 2025, pre-hearing brief, did the Appellant submit any medical literature." *Id.* That premise is wrong. At the reconsideration level, Plaintiff submitted an expert report which included a table of clinical studies of amniotic membrane products for wound healing. The QIC's own decision acknowledges that "the provider/appellant submitted several journal articles which reportedly support the use of service Q4262." *See* Ex. 2. By excluding evidence already before the agency, not finding good cause, misstating the record, and resting his "experimental and investigational" finding on the gap he himself created, the ALJ acted arbitrarily and capriciously, and his decision is otherwise unsupported.

64. The ALJ's misapplication of Medicare coverage criteria, coupled with his product misclassification and disregard for the administrative record, rendered his decision arbitrary and contrary to law.

**Level 4: Medicare Appeals Council**

65. On September 18, 2025, Plaintiff timely requested that the Council review the ALJ's unfavorable decision pursuant to 42 C.F.R. § 405.1102.

66. The 90-day timeframe for the Council to issue a decision, dismissal, or remand order expired without any action by the Council. *See* 42 C.F.R. § 405.1100(c).

67. On July 14, 2026, Plaintiff, through Holland & Knight LLP, filed a Brief in Support of its Request for Council Review and simultaneously submitted a Request for Escalation to Federal Court pursuant to 42 C.F.R. § 405.1132. The Brief detailed the fundamental errors in the ALJ's decision, including the product misclassification, the failure to weigh applicable LCDs, the disregard of peer-reviewed clinical literature, and the failure to consider beneficiary-specific medical necessity.

68. In the Brief, Plaintiff demonstrated that each beneficiary fell squarely within LCD L36377's coverage criteria—R.M. and J.S. presented with chronic diabetic foot ulcers resulting from their type 2 diabetes mellitus and peripheral vascular disease, while D.O. presented with chronic venous leg ulcers—and that all three had undergone documented conservative wound care for well beyond the four-to-six-week minimum the LCD requires before receiving skin substitute applications.

69. Because the Council failed to act within the 90-day statutory timeframe, Plaintiff has invoked its right to judicial review in federal district court. On August 20, 2026, the Council granted Plaintiff's request for escalation, finding that it was unable to issue a decision, dismissal, or remand order within five calendar days of the request. *See* Ex. 4. The ALJ's unfavorable decision therefore constitutes the final administrative action subject to review.

**J. The Secretary's Unlawful Retroactive Denial Policy**

70. The retroactive denial and recoupment of Plaintiff's claims for Impax did not arise from any deficiency unique to Plaintiff's treatment of the Beneficiaries. Rather, it reflects a broader, undisclosed policy under which the Secretary's agents, including MACs, QICs, and UPICs, have systematically reopened and recouped previously paid Medicare claims for skin substitute products, including Impax, on the ground that such products are suddenly "experimental" or "investigational," notwithstanding years of prior Medicare coverage and payment for the very same products.

71. On information and belief, other Medicare providers who furnished Impax and other skin substitute products to their patients have experienced the same sequence of events as Plaintiff: claims that Medicare initially paid were later reopened and denied as purportedly experimental or investigational, often based on a product's "Q" billing code rather than on any new clinical evidence and, where an

ALJ ruled in the provider's favor, the favorable decision was referred by CMS or the AdQIC to the Council for own-motion review and reversal.

72. Indeed, there are numerous other Medicare providers that use skin substitute products for Medicare beneficiaries suffering from chronic/non-healing wounds who have also filed civil actions against the Secretary and CMS in federal courts throughout the nation for unlawful Medicare denial practices associated with skin substitutes. *See, e.g.*, Compl. ¶ 5, *Koonce*, No. 5:25-cv-00360 (Medicare Appeals Council vacating, on Council's own motion, three favorable ALJ decisions and because the provider "failed to provide authoritative evidence to support a finding that Impax was 'safe and effective, not experimental or investigational, and appropriate for the beneficiary's condition,'" even though the MAC approved seven of ten treatments for the beneficiary at issue); Compl. ¶ 1 & Ex. A at 14, *Riegelhaupt*, No. 1:24-cv-07606 (Medicare Appeals Council, on its own motion, reversing favorable ALJ decision because it was "ultimately unable to ascertain whether . . . EpiFix, PuraPly AM, and DermACELL products are safe and effective, and not experimental or investigational.").

73. The Retroactive Denial Policy departs, without explanation, from the Secretary's longstanding practice of covering skin substitute products, including HCT/Ps such as Impax. Under this new approach, the Secretary's agents label a skin substitute product as "investigational" or "experimental" unless the provider can

produce voluminous peer-reviewed literature demonstrating that specific product's effectiveness. This requirement is unprecedented. Neither the FDA nor CMS has ever required providers to compile product-specific clinical studies as a condition of coverage during the many years in which skin substitute claims were routinely paid; no statute, regulation, NCD or LCD establishes such a requirement, and its sudden imposition has left wound care providers without fair warning.

74. The Secretary and his agents have not identified any new clinical evidence, changed medical consensus, or amended any NCD, LCD, or other coverage policy that would justify reclassifying skin substitute products that were previously covered as "experimental" or "investigational." Nor have the Secretary and his agents provided notice and an opportunity for public comment before adopting and applying this changed coverage standard, even though such notice and comment is required for changes that affect substantive Medicare payment standards.

**K. CMS's Failed Attempts to Formalize the Retroactive Denial Policy Through LCDs**

75. Indeed, the Secretary's own contractors attempted several times to accomplish through proposed LCD changes what the Retroactive Denial Policy now accomplishes without any such notice-and-comment process: a sweeping narrowing of coverage for skin substitute products based on the same "experimental" or "investigational" rationale. Multiple attempts, in 2022-2023 and again in 2024,

failed and were withdrawn before ever taking effect, almost certainly because they lacked adequate justification and did not follow the required procedures. *See* Ex. 5 (CMS notice regarding updates to final 2026 LCDs) and Ex. 6 (CMS withdrawal notice regarding final 2026 LCDs). The Secretary even updated the Medicare Part B payment methodology for skin substitutes effective January 1, 2026 in CMS's CY 2026 Physician Fee Schedule without limiting the brand of skin substitute products that would be covered.

76. The Secretary cannot lawfully achieve, through an undisclosed Retroactive Denial Policy, the same substantive result that his own contractors were unable to achieve prospectively through attempted LCDs. The repeated failure to adopt these LCDs through the proper notice-and-comment process underscores that CMS has been enforcing the Retroactive Denial Policy without lawful authority and in circumvention of the required rulemaking process.

77. The Retroactive Denial Policy, and its application to deny and recoup Plaintiff's claims for the Impax treatments furnished to the Beneficiaries is arbitrary, capricious, and contrary to law for the reasons alleged herein.

## V. Claims for Relief

### Count I:
### Violations of the Administrative Procedure Act
### (Against All Defendants)

78. Plaintiff incorporates and realleges paragraphs 1-77 as if fully set forth herein.

79. Under the Administrative Procedure Act ("**APA**"), a reviewing court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency acts arbitrarily and capriciously when it reverses course without a reasoned explanation, when it treats similar cases differently without explanation, or when it fails to consider evidence contrary to its conclusion.

80. The ALJ's decision is arbitrary and capricious because he effectively treated the MPIM—sub-regulatory guidance that, by its own terms, governs MACs, CERT, Recovery Auditors, and UPICs, and that 42 C.F.R. § 405.1062(a) subjects to "substantial deference" rather than mandatory compliance—as a binding legal command the ALJ was required to follow, without any reasoned basis for that departure from the regulation's plain terms. The Council failed to correct this error when it took no action on Plaintiff's timely request for review.

81. The ALJ's decision is also arbitrary and capricious because it declared Impax experimental and investigational while disregarding the applicable LCD and

misclassifying the product as an "amniotic fluid allograft." That misclassification caused the ALJ to apply an erroneous analytical framework instead of evaluating the non-fluid membrane allograft under the coverage criteria applicable to skin substitute grafts.

82. The ALJ's decision is further arbitrary and capricious because it failed to give proper deference to the treating-clinician's determination of medical necessity for the Beneficiaries, erroneously refused to consider on-point medical literature, repeatedly misclassified Impax as an "amniotic fluid allograft," and applied an erroneous analytical framework that treated the product as experimental and investigational.

83. The ALJ's decision is additionally arbitrary and capricious because it failed to consider the significant reliance interests at stake in reversing Medicare's longstanding practice of covering and paying for skin substitute products, including the reliance interests created when Plaintiff furnished the Dual Layer Impax Membrane treatments after Medicare initially paid the claims.

84. As a direct result of the ALJ's unlawful decision, which is the final decision of the Defendants collectively, Plaintiff has been denied Medicare payment to which it is entitled and has been found liable for an overpayment. Plaintiff seeks judicial review of that final administrative action under 42 U.S.C. §§ 405(g) and 1395ff.

**Count II:**
**Violation of the Medicare Statute, 42 U.S.C. § 1395y(a)(1)(A)**
**(Against All Defendants)**

85. Plaintiff incorporates and realleges paragraphs 1-77 as if fully set forth herein.

86. Under 42 U.S.C. § 1395y(a)(1)(A), Medicare must pay for items and services that are reasonable and necessary for the diagnosis or treatment of illness or injury, except for services the statute specifically excludes. Plaintiff brings this claim pursuant to 42 U.S.C. § 405(g), which authorizes judicial review of whether the Defendants correctly applied the reasonable-and-necessary standard to the facts of this case, independent of whether the ALJ's decision-making process satisfied the arbitrary-and-capricious standard alleged in Count I.

87. Plaintiff treated the Beneficiaries with Impax, which is reasonable and medically necessary, as evidenced by the underlying administrative record, treatment documentation including the medical literature and ALJ decision covering the Impax treatments provided to the Beneficiaries.

88. The ALJ's finding that Impax was not reasonable and necessary is contrary to 42 U.S.C. § 1395y(a)(1)(A) because the product belongs to a class of items long recognized as safe, effective, and appropriate for the treatment of chronic, non-healing wounds.

89. Defendants' collective failure to authorize payment to Plaintiff for the Impax skin substitute and related application services furnished to the Beneficiaries is a violation of the Medicare Statute.

**Count III:**
**Violation of the Medicare Statute, 42 U.S.C. § 1395pp:**
**Limitation on Liability/Waiver of Recovery**
**(Against All Defendants)**

90. Plaintiff incorporates and realleges paragraphs 1-77 as if fully set forth herein.

91. Under 42 U.S.C. § 1395pp(a), where Medicare payment for an item or service is disallowed—for example, under 42 U.S.C. § 1395y(a)(1)—but both the beneficiary and the provider or supplier did not know, and could not reasonably have been expected to know, that payment would not be made, payment must nonetheless be made notwithstanding the disallowance, as though the exclusion did not apply. A provider or supplier is liable for repayment of an overpayment, and is not entitled to this limitation on liability, only if it knew, or could reasonably have been expected to know, that payment would not be made.

92. The ALJ found that Plaintiff knew or should have known that Medicare's coverage requirements were not satisfied, and further found that Plaintiff, rather than the beneficiary, is financially liable for the non-covered costs and not entitled to a waiver of recovery of the resulting overpayment.

93. That finding is contrary to 42 U.S.C. §§ 1395pp. Neither Plaintiff nor the Beneficiaries knew, nor could reasonably have been expected to know, that Medicare would not cover treatment, and Plaintiff was without fault in receiving the payments at issue.

94. In fact, Medicare itself had already reviewed and paid for the treatment in this case before abruptly reversing itself without identifying any new evidence, any change in governing law, or any development in the medical literature that would justify a different outcome.

95. The Defendants have acted to deny Plaintiff the limitation on liability and waiver of recovery to which it is entitled under 42 U.S.C. §§ 1395pp in violation of the Medicare Statute.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Quantum Practitioner Services, LLC respectfully requests that this Court enter judgment in its favor and against Defendant as follows:

a. Reverse the Administrative Law Judge's unfavorable decision dated July 15, 2025, and order the Defendants to process and pay Plaintiff's claims;

b. Declare that Plaintiff is not liable for any overpayment relating to the claims at issue;

c. Declare the Defendants' Retroactive Denial Policy unlawful, arbitrary, and capricious, and enjoin its further application to Plaintiff's claims;

d. Award Plaintiff its reasonable costs and attorneys' fees to the extent permitted by law; and

e. Grant such other and further relief as this Court deems just and proper.

Dated: November 3, 2026

Respectfully submitted,

Holland & Knight LLP

By: *<u>/s/ Paul J. Punzone</u>*

Paul J. Punzone
Paul.Punzone@hklaw.com
100 North Tampa Street, Suite 4100
Tampa, Florida 33602
(813) 227-6527

Ismail M. Ercan
Ismail.Ercan@hklaw.com
777 South Flagler Dr.
Ste. 1900, West Tower
West Palm Beach, Florida 33401
(561) 650-8387

Juliet M. McBride (*pro hac forthcoming*)
Juliet.McBride@hklaw.com
811 Main Street, Suite 2500
Houston, Texas 77002
(713) 244-8244

Brandon L. King (*pro hac forthcoming*)
Brandon.King@hklaw.com
98 San Jacinto Blvd., Suite 1900
Austin, Texas 78701
(512) 469-6126

**COUNSEL FOR PLAINTIFF**